UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETT

| | |
|---|---|
| BETTE J. RIVARD, as Administratrix of the Estate of John A Horton,<br>            Plaintiff,<br>    v.<br>DARTMOUTH HOUSE OF CORRECTION, BRISTOL COUNTY, JOHN DOE, RICHARD ROE, Bristol County Corrections employees the identity and number of whom is presently unknown to the Plaintiff,<br>        Defendants/Third Party Plaintiffs,<br>    v.<br>PRISON HEALTH SERVICES, INC. and CORRECTIONAL HEALTH CARE SOLUTIONS, INC.<br>        Third Party Defendants | Civil Action No.: **O4CV12058WGY**<br><br>**PLAINTIFF BETTE J. RIVARD'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT** |

NOW COMES the Plaintiff, Bette J. Rivard, in the above captioned matter, by and through her attorneys, 𝔓𝔯𝔬𝔲𝔩𝔵 𝔏𝔞𝔴 𝔄𝔰𝔰𝔬𝔠𝔦𝔞𝔱𝔢𝔰, 𝔓.𝔆., and moves this Honorable Court to deny the Defendants' joint motion for summary judgment and for reasons says:

1. That customs and policies can be established by the conduct of the parties. There is no need to demonstrate a written or approved writing that outlines a policy or custom for the conduct complained of to qualify as a custom and/or policy.

2. That a motion to amend the complaint was filed and denied by this court on or about 08/18/2005 in which the Plaintiff would have named PHS as a Defendant in this case.

3. That a second complaint was filed on or about 09/23/2005 docket No. 05-11932-DPW wherein Plaintiff names THOMAS M. HODGSON, individually and as he is the Bristol County Sheriff, Glen H. STURGEON, individually and as he is Deputy Superintendent of the Bristol County House of Correction, PRISON HEALTH SERVICES, INC., PETER BERTHIAUME and SUSAN ANDREWS as Defendants.

Proulx Law Associates, P.C.
*Attorneys at Law*
170 High Street, Suite 301
Taunton, MA 02780-3536

(508) 823-6441

4. That this case should not be allowed to become a trial by affidavit as the Defendants in their brief rely on numerous exhibits that were produced for the sole purpose of cleaning up the mess of liability created by the Defendants negligent acts in this case.

WHEREFORE, the Plaintiff moves this Honorable Court to deny the Defendants' joint motion for summary judgment.

Dated this the 04th day of January, 2006.

> PLAINTIFF,
> Bette J. Rivard,
> By her Attorney,
>
> *[signature: Robert M. Proulx, Esq.]*
> Robert M. Proulx, Esquire
> **Proulx Law Associates, P.C.**
> *Attorneys at Law*
> 170 High Street, Suite 301
> Taunton, Massachusetts 02780-3536
> Phone: 508.823.6441
> Facsimile: 508.967.2737
> BBO# 640653

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served via email and first class mail postage pre-paid, on January 04th, 2006 to:

| √ | Regina M. Ryan, Esquire<br>Merrick Louison & Costello<br>67 Batterymarch Street<br>Boston, MA 02110 | √ | Mary C. Eiro-Bartevyan, Esquire<br>Koufman & Frederick, LLC<br>265 Essex Street, Ste. 301<br>Salem, MA 01970 |

> PLAINTIFF,
> Bette J. Rivard,
> By her Attorney,

**Proulx Law Associates, P.C.**
*Attorneys at Law*
170 High Street, Suite 301
Taunton, MA 02780-3536
(508) 823-6441

*PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT*   *Page -2- of -3-*

*[signature: Robert M. Proulx, Esq.]*
Robert M. Proulx, Esquire
**Proulx Law Associates, P.C.**
*Attorneys at Law*
170 High Street, Suite 301
Taunton, Massachusetts 02780-3536
Phone: 508.823.6441
Facsimile: 508.967.2737
BBO# 640653

**Proulx Law Associates, P.C.**
*Attorneys at Law*
170 High Street, Suite 301
Taunton, MA 02780-3536

(508) 823-6441

*PLAINTIFF'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT*     *Page -3- of -3-*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETT

| | |
|---|---|
| BETTE J. RIVARD, as Administratrix of the Estate of John A Horton,<br>　　　　Plaintiff,<br>　　v.<br>DARTMOUTH HOUSE OF CORRECTION, BRISTOL COUNTY, JOHN DOE, RICHARD ROE, Bristol County Corrections employees the identity and number of whom is presently unknown to the Plaintiff,<br>　　　　Defendants/Third Party Plaintiffs,<br>　　v.<br>PRISON HEALTH SERVICES, INC. and CORRECTIONAL HEALTH CARE SOLUTIONS, INC.<br>　　　　Third Party Defendants | Civil Action No.: O4CV12058WGY<br><br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF HER OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT** |

NOW COMES the Plaintiff, Bette J. Rivard, in the above captioned matter, by and through her attorneys, 𝔓𝔯𝔬𝔲𝔩𝔵 𝔏𝔞𝔴 𝔄𝔰𝔰𝔬𝔠𝔦𝔞𝔱𝔢𝔰, 𝔓.𝔒., and respectfully submits her Memorandum in Support of her Opposition to the Defendant's Joint Motion for Summary Judgment.

The Plaintiff states that the Defendants are not entitled to summary judgment on any of the counts of the Plaintiff's complaint because there are disputed issues of fact and, if not that the Defendant is not entitled to a judgment as a matter of law.

## I. INTRODUCTION

Pursuant to Fed. R. Civ. P. Rule 56, Defendants Dartmouth House of Correction and Bristol County ("Bristol County Defendants"), and Third Party Defendant Prison Health Services ("PHS"), have moved for summary judgment, and have submitted their memorandum in support of that motion.

Plaintiff, Bette Rivard ("Plaintiff"), is Administratrix for the estate of John A. Horton, who, on September 29, 2002, died of encephalitis while in the custody of the Bristol County Defendants. At the time, PHS was providing Mr. Horton with medical care.

The Plaintiff's complaint, is that the Bristol County Defendants violated Mr. Horton's civil rights (42 U.S.C. §1983) by developing and maintaining "policies or customs exhibiting deliberate indifference to the constitutional rights" of inmates (Count III), and by being deliberately indifferent to Mr. Horton's serious medical needs (Counts I & II).

The Plaintiff also alleges that the Bristol County Defendants violated the Massachusetts Wrongful Death Statute (M.G.L. c. 229, §2) by "failing to provide necessary medical treatment that would have saved John Horton's life" (Count IV).

The Bristol County Defendants, who impleaded PHS as a third-party Defendant, allege that in the event they are liable to the Plaintiff PHS is obligated to indemnify them pursuant to the common law principles of contribution and a contract that requires PHS to provide certain medical care to inmates like Mr. Horton.

As is discussed below, the Defendants are not entitled to judgment as a matter of law due to the following:

(A) The record while still incomplete as of this date, demonstrates that the trier of fact could reasonably conclude that Bristol County employees acted indifferently toward the medical needs of Mr. Horton and that that indifference has a causal relationship to Mr. Horton's demise.

(B) The undisputed material facts demonstrate the Bristol County Defendants were deliberately indifferent to Mr. Horton's serious medical needs; And,

(C) The County Defendants did violate the Wrongful Death statute, because such a claim can be brought against Municipal employees.

## II. BACKGROUND

In November of 2004, the Plaintiff filed this civil rights and wrongful death action.

On November 16, 2004, the Bristol County Defendants impleaded PHS as a third-party Defendant for indemnification and contribution.

On February 1, 2005, PHS answered the complaint.

On July 28, 2005, the Plaintiff filed a motion to amend her Complaint by adding as Defendants Thomas Hodgson, Glen Sturgeon, Peter Berthiaume, who are associated with the

County, by adding as defendants PHS and a PHS physician, Susan Andrews, M.D., and by adding a negligence claim against both the Bristol County Defendants and the medical defendants. All named defendants filed an opposition to the motion to amend.

On August 18, 2005, the Court (Young, J.) denied the Plaintiffs motion to amend the Complaint as "untimely."

On August 25, 2005, the Plaintiff filed a motion to extend the time for discovery, which was denied by the Court on September 7, 2005

On September 23, 2005, the Plaintiff filed another complaint in the United States District Court (Docket No. 05-11932-DPW), which lists different defendants and different claims from the first complaint.

The Court's deadlines in the case at hand includes the following: Written discovery by May 15, 2005; Depositions by September 15, 2005; Plaintiffs expert disclosure by November 1, 2005; Defendant's expert disclosure after Plaintiffs expert disclosure per Fed. R. Civ. P. 26(b)(4)(A); Dispositive motions by December 1, 2005; and trial in February 2006.

## LOCAL RULE 56.1 CONCISE STATEMENT
## OF UNDISPUTED MATERIAL FACTS

1. Bristol County is a Municipality. See M.G.L.c. 258, §1.

2. Bristol County entered into a contract with PHS, which commenced on December 6, 2000, to provide certain medical services to inmates incarcerated in Bristol County House of Correction. This contract was in place during the time period relevant to the complaint

3. PHS is an independent contractor with respect to Bristol County. (See section 13 of Defendants' Exhibit B)

4. The Decedent, John A. Horton, entered the Bristol County House of Correction on March 26, 2001 to serve a 2 ½ year sentence for receiving stolen property, which was to be served concurrently with a sentence for a parole violation. He remained in the

custody of the Bristol County House of Correction until his death on September 29, 2002 (Defendants' Exhibit C).

5. Between March 26, 2002 and September 29, 2002, PHS medical staff saw Mr. Horton and received only Motrin and/or aspirin for his complaints.

6. During this time, Mr. Horton was cared for by Licensed and Registered Nurses who saw and treated Mr. Horton only sporadically.

7. On September 1, 2005, the plaintiff noticed the depositions of persons associated with the Defendants for September 12, 2005, namely, Susan Andrews, M.D., Peter Berthiaume, and Glen Sturgeon; however, those depositions have not taken place due to scheduling issues. The Defendants have noticed two remaining depositions. The Court granted the defendants leave pursuant to Fed. Rules Civ. Proc. R. 30(a)(2) to take the deposition of a person who is incarcerated, Mark Higgins. This deposition is scheduled for December 13, 2005. Defendants had noticed the deposition of Mark Duarte for dates prior to the discovery deadline. However, Mr. Duate was not available for his deposition on two occasions. His deposition is now scheduled for December 13, 2005. Although the defendants noticed a number of other depositions on dates prior to the discovery deadline, these depositions did not go forward, because plaintiff has not provided addresses for those individuals. (See Joint Opposition to Motion to Extend Discovery, previously filed with the Court)

8. During this six-month period, Mr. Horton was received only Motrin and/or aspirin to treat his multiple health problems.

9. During this six month period, Mr. Horton was not referred to outside physicians for consultations and or other care.

10. Throughout Mr. Horton's incarceration he complained of headaches and other symptoms, which should have been easily diagnosed and treated by qualified and competent medical personnel.

11. On September 29, 2002, Mr. Horton died (Defendants' Exhibit A).

12. According to the autopsy report, the cause of death was "subacute encephalitis" (Defendants' Exhibit A, page 4).

## SUMMARY JUDGMENT STANDARD

A party moving for summary judgment must show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In showing that no genuine issue of material fact exists, the party moving for summary judgment need only show "an absence of evidence to support the nonmoving party's case." Celotex Corp. y. Catrett, 477 U.S. 317, 325 (1986). Summary judgment is mandated when the party who has the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322. The party moving for summary judgment is not required to negate the opposing party's claim by producing affirmative evidence disproving that essential element; the moving party must only show that there is an absence of evidence by which the non moving party can prove its case. Celotex Com. v. Catrett, 477 U.S. at 325.

In order to defeat a motion for summary judgment, a plaintiff must demonstrate a genuine issue of material fact on every element essential to her case in chief. A genuine issue is one where the party opposing summary judgment provides evidence *"such that a reasonable jury could return a verdict for the nonmoving party."* Daury v. Smith, 842 F.2d 9, 11 (1st Cir. 1988). A plaintiff is not allowed to rely upon unreasonably speculative inferences, (See Mesnick v. General Elec. Co., 950 F.2d 816, 826 (1st Cir. 1991)), but must present concrete evidence in support of the essential elements of his or her case. Celotex Corp. v. Catrett 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the plaintiff s position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc. 477 U.S.242, 248 (1986).

The application of the above standards to the record that the parties have established in this case, as is discussed below, have not demonstrated that the Bristol County or any other Defendants are entitled to Judgment as a matter of law.

## III. ARGUMENTS

I.  **THE DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW IN REGARD TO ALL PLAINTIFF'S CIVIL RIGHTS CLAIMS BECAUSE THE UNDISPUTED MATERIAL FACTS DO NOT DEMONSTRATE AN ABSENCE OF A TRIABLE ISSUE IN REGARD TO CUSTOMS OR POLICIES WITHIN BRISTOL COUNTY.**

Liability against municipalities may be based upon a single incident, and the requirements of "policy" and "custom" do not necessitate proof of a long standing practice. The act of a policy maker on behalf of the Defendant(s) is sufficient to establish that a "policy" or "custom". <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986). Numerous witnesses have testified at their respective depositions that a "policy maker", Peter Berthiaume, who is an employee of the Bristol County Department of Corrections had investigated complaints regarding the inadequacy of the medical care received by Mr. Horton. The witnesses had each stated that Mr. Bertiaume indicated that the care Mr. Horton received was in his opinion adequate. See copies of the deposition transcripts of Rivard Depo. At pages 76-81, **Exhibit A**[1] and Horton Depo. At pages 168-175, **Exhibit B**.[2]

Mr. Berthiaume's acts of failing to identiy and resolve the adequacy of Mr. Horton's treatment has a causal connection to Mr. Horton's failure to receive appropriate treatment and this ultimately resulted in Mr. Horton's death.

Additionally, the record is incomplete as it relates to the municipal employees. Plaintiff's counsel had noticed the depositions of Peter Berthiaume, Susan Andrews and Glen Sturgeon. Defense counsel requested that the depositions be conducted on another day as each of them had scheduling conflicts.

II. **THE DEFENDANTS ARE NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW BECAUSE THE UNDISPUTED MATERIAL FACTS DEMONSTRATE THAT BRISTOL COUNTY WAS DELIBERATELY INDIFFERENT TO MR. HORTON'S SERIOUS MEDICAL NEEDS.**

---

[1] Relevant Rivard transcript pages attached hereto and made part hereof as **EXHIBIT A**.
[2] Relevant Horton transcript pages attached hereto and made part hereof as **EXHIBIT B**.

Mr. Horton was treated as a "whiner" or "complainer" and as a result his repeated requests for medical attention resulted in some instances where no treatement was provided and in other wholly inadequate treatment was provided. See copies of the deposition transcripts of Rivard Depo. At pages 76-81, **Exhibit A**.[3]

### III. THE COUNTY DEFENDANTS ARE NOT ENTITLED TO A JUDGMENT AS A MATTER OF LAW CONCERNING COUNT IV OF THE COMPLAINT, BECAUSE M.G.L. C. 229, § 2 ACTION CANNOT BE BROUGHT AGAINST A MUNICIPALITY FOR THE ALLEGED ACTS OF AN INDEPENDENT CONTRACTOR.

The municipal employees acting in their respective capacities owed a duty to John Horton and other inmates to properly supervise the provision of medical services to inmates. Municipal liablility of the deriliction of those duties cannot be avoided simply by contracting with an independent contractor. The complaints and adequacy of the care that John Horton as well as other inmates received should have placed the municipality on notice that the care inmates were receiving is/was potentially inadequate. Municipal employees set policy by acquiescing to the negligible level of care that inmates received and are thereby culpable under M.G.L.C. 229 § 2.

### IV. CONCLUSION

In light of the foregoing reasons, the plaintiff, Bette J. Rivard, respectfully requests that this Honorable Court deny the defendants' joint motion for summary judgment.

Dated this the 04th, day of January 2006.

Respectfully submitted,
PLAINTIFF,
By her Attorney,

---

[3] Relevant transcript pages attached hereto and made part hereof as EXHIBIT A.

*[signature]*
Robert M. Proulx, Esquire
**Proulx Law Associates, P.C.**
*Attorneys at Law*
170 High Street, Suite 301
Taunton, Massachusetts 02780-3536
(508) 823-6441
BBO# 640653

### CERTIFICATE OF SERVICE

I, Robert M. Proulx of **Proulx Law Associates, P.C.**, counsel for the Plaintiff in the above-entitled matter, hereby certify that on January 04th, 2006 I mailed, postage prepaid, a copy of the foregoing brief to the following counsels of record:

| | | | |
|---|---|---|---|
| √ | Regina M. Ryan, Esquire<br>Merrick Louison & Costello<br>67 Batterymarch Street<br>Boston, MA 02110 | √ | Mary C. Eiro-Bartevyan, Esquire<br>Koufman & Frederick, LLC<br>265 Essex Street, Ste. 301<br>Salem, MA 01970 |

*[signature]*
Robert M. Proulx, Esquire
**Proulx Law Associates, P.C.**
*Attorneys at Law*
170 High Street, Suite 301
Taunton, Massachusetts 02780-3536
(508) 823-6441
BBO# 640653

|   |   |   |
|---|---|---|
| 1 |   | conversation? |
| 2 | A | That was it. |
| 3 | Q | As a result of that, did you do anything? |
| 4 | A | I called Peter Bartholomew. |
| 5 | Q | How long after your first conversation with Dr. |
| 6 |   | Andrews did you call Peter Bartholomew? |
| 7 | A | I don't know.  It was in approximately a day, a |
| 8 |   | day and a half. |
| 9 | Q | What did you say to Peter Bartholomew? |
| 10 | A | I told him exactly what happened with Dr. Andrews. |
| 11 | Q | And what happened? |
| 12 | A | He said he would look into it. |
| 13 | Q | Do you recall anything else about your |
| 14 |   | conversation with Peter Bartholomew? |
| 15 | A | I talked to him several times. |
| 16 | Q | How many times did you talk to Peter Bartholomew |
| 17 |   | between 2000 and September of 2002? |
| 18 | A | Five, approximately. |
| 19 | Q | Correct me if I'm wrong, but before you said |
| 20 |   | during this period of time from 2000 to |
| 21 |   | approximately September of 2002, you spoke with |
| 22 |   | Dr. Andrews two times; is that correct? |
| 23 | A | Correct. |
| 24 | Q | And when you spoke the first time, was that |

**EXHIBIT A**

|    |   |                                                                    |
|----|---|--------------------------------------------------------------------|
| 1  |   | sometime right when he was incarcerated in the                     |
| 2  |   | Dartmouth House of Correction?                                     |
| 3  | A | Correct.                                                           |
| 4  | Q | And then the next time, was it closer to John's                    |
| 5  |   | demise?                                                            |
| 6  | A | I don't know what demise is, I'm sorry.                            |
| 7  | Q | Was it closer to when John died, passed away?                      |
| 8  | A | Yes.                                                               |
| 9  | Q | Was it before or after, if you can recall, before                  |
| 10 |   | or after the last time you saw him?                                |
| 11 | A | It was after.                                                      |
| 12 | Q | How long was that conversation?                                    |
| 13 | A | Three or four minutes.                                             |
| 14 | Q | So the first conversation was very brief with Dr.                  |
| 15 |   | Andrews; is that correct?                                          |
| 16 | A | Yes.  She hung up on me.                                           |
| 17 | Q | And the second one was three or four minutes; is                   |
| 18 |   | that correct?                                                      |
| 19 | A | No.                                                                |
| 20 | Q | No?  Oh, I'm sorry.                                                |
| 21 | A | She hung up on me right away.                                      |
| 22 | Q | I mean the second conversation.                                    |
| 23 | A | You're talking about Dr. Andrews or Peter?                         |
| 24 | Q | Dr. Andrews.                                                       |

EXHIBIT A

1    A    She hung up on me.
2    Q    Okay.
3    A    Both times.
4    Q    Both times, okay. So you've already told me
5         everything you can recall about the first
6         conversation.
7              Can you tell me what you can recall about the
8         second conversation?
9    A    She said, "I don't know who put you through, but
10        I'm not talking to you."
11   Q    So the second conversation was similar to the
12        first conversation?
13   A    Yes.
14   Q    As a result of that conversation, the second
15        conversation, did you call Peter Bartholomew
16        again?
17   A    Yes.
18   Q    Other than those two conversations with Dr.
19        Andrews, do you recall ever speaking with her or
20        seeing her at any other time?
21   A    No.
22   Q    When you spoke to Peter Bartholomew, do you recall
23        the substance of your conversations with him?
24   A    I'm sorry, the what?

**EXHIBIT A**

| | | |
|---|---|---|
| 1 | Q | The substance of your conversations with him. |
| 2 | A | Yes. I told him I was concerned. This was when |
| 3 | | John's back was bothering him and his head, mostly |
| 4 | | his head. And I expressed my concerns and I |
| 5 | | actually told him that he was in such bad shape, I |
| 6 | | didn't want him to pass away in jail. |
| 7 | | He promised to call me back, which he did. |
| 8 | | He told me John was fine. There's nothing wrong |
| 9 | | with him. |
| 10 | Q | And that was your second conversation with him |
| 11 | | when he said John was fine? |
| 12 | A | I don't know if it was my first, second, third, |
| 13 | | fourth, fifth. I did talk to him at least five |
| 14 | | times. |
| 15 | Q | In that five times that you spoke with Peter |
| 16 | | Bartholomew, that was during the period of time |
| 17 | | sometime between 2000 and his death in September |
| 18 | | of 2002? |
| 19 | A | Yes. |
| 20 | Q | Can you tell me anything more about the substance |
| 21 | | of your conversations with Mr. Peter Bartholomew |
| 22 | | during this period of time in 2000 and September |
| 23 | | of 2002, other than what you've already told me? |
| 24 | A | No. I did tell him about John's Crohn's disease. |

**EXHIBIT A**

80

1         I did tell him about John's headaches, that was
2         basically the extent.
3   Q  Do you recall anything else that you told Peter
4         Bartholomew?
5   A  No.
6   Q  Did you ever discuss with Peter Bartholomew Dr.
7         Andrews' reaction to your phone calls?
8   A  Once.
9   Q  And when was that, if you can recall?
10  A  I don't know the date.
11  Q  What did you say to him?
12  A  Exactly what I told you, she hung up on me.
13  Q  As a result of Dr. Andrews hanging up on you, did
14        you do anything, other than call Peter
15        Bartholomew?
16  A  I had called the jail many a times.  I talked to
17        Major Santos several times.
18  Q  Anybody else?
19  A  Peter, Sergeant Mendez.
20  Q  Anybody else?
21  A  One girl in medical.  I don't know her name.
22  Q  But it wasn't Dr. Andrews though?
23  A  No.
24  Q  Anybody else?

**EXHIBIT A**

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Major Santos, during the period of time from 2000 |
| 3 | | to September of 2002, how many times did you speak |
| 4 | | with him? |
| 5 | A | I can't recall. |
| 6 | Q | Was it more than once? |
| 7 | A | Yes. |
| 8 | Q | Was it more than five times? |
| 9 | A | No, I don't think so. |
| 10 | Q | Do you recall the substance of your conversation |
| 11 | | with him? |
| 12 | A | Some of it. |
| 13 | Q | What was that? |
| 14 | A | That I was concerned about John.  That I had |
| 15 | | gotten a phone call from an inmate or somebody at |
| 16 | | the prison that John was not in good shape, and he |
| 17 | | said that it wouldn't happen on his watch and he |
| 18 | | would go and check on John for me. |
| 19 | Q | Do you recall anything else about that |
| 20 | | conversation that you had with Major Santos? |
| 21 | A | That was it. |
| 22 | Q | As a result of that, did something happen? |
| 23 | A | I believe I called him back.  I don't know if he |
| 24 | | called me back or I called him back.  And he said, |

**EXHIBIT A**

**Page 168**

1  too much going on with the drugs with, you know,
2  the living situation. Diane and John thought that
3  it would be maybe good for them if they went to my
4  cousin's house. I have a cousin who lives out in
5  Florida, my cousin Danny. They thought that it
6  would be a different atmosphere and it might help
7  John change his ways. And she works, you know,
8  and he's a mechanic, and the wife works at a
9  hospital. So he thought that she could maybe get
10 him some help once he went down there.
11         But when he went down there, he had to come
12 back up here and Diane stayed there. And when he
13 came back up here, he got caught for stealing
14 something and he got arrested, so Diane got
15 stranded down in Florida. But then she ended up
16 coming home, you know, a couple of weeks later.
17 That was another reason why Diane was so made at
18 Johnny, you know, because of the things that he
19 did like that.
20 Q  Have you told me all the conversations that you've
21    had with any correction officers at any of the
22    jails regarding your brother? You testified
23    earlier about a picture that one of the correction
24    officers alleged your brother drew.

**Page 169**

1  A  Um-hum.
2  Q  Any other conversations that you ever remember
3     having with any correction officers at any of the
4     jails that you visited him at?
5  A  About him being destructive?
6  Q  No, just about your brother in general or about
7     anything?
8  A  Did I make conversation?
9  Q  You know what, let me re-ask the question, because
10    I think it was a bad question.
11 A  All right.
12 Q  Have you ever had any conversations with any
13    correction officers at any jails regarding your
14    brother?
15 A  No. The only conversation I had was about the
16    character Johnny drew on the wall.
17          Would I talk to them, you mean, about my
18    brother being sick? Is that what you mean?
19 Q  About anything about your brother?
20 A  No. I don't believe so.
21 Q  Did your brother ever identify by name any of the
22    correction officers that he alleges didn't believe
23    him when he said he wasn't feeling well?
24 A  Bartholomew.

**Page 170**

1  Q  Do you know how to spell that?
2  A  No.
3  Q  Any other correction officers that your brother
4     identified?
5  A  No. I don't have the names.
6  Q  Do you know Bartholomew's first name?
7  A  No. I don't know if that's his first name or his
8     last name. I have no idea.
9  Q  What did your brother say about him?
10 A  That he was a jerk and he always ignored Johnny
11    and treated him like crap and swore at him all the
12    time.
13 Q  Anything else?
14 A  No.
15 Q  Did you remember something? Go ahead.
16 A  Yes. I think that when I was at the hospital when
17    my brother passed away, there was a correction
18    officer there and I yelled at him. We said words.
19    I don't know if that's what you mean. But I
20    yelled at him, because I asked him what happened
21    and he wouldn't tell me. He said he wasn't at
22    liberty. And I was yelling at him. I was telling
23    him he was awful, because he let Johnny die with
24    the handcuffs and leg shackles on. When they

**Page 171**

1     pulled the thing, I was yelling at him telling him
2     that he was an awful person.
3  Q  Do you know who that was?
4  A  No. I don't remember who it was. I was upset
5     because of everything that happened. And I didn't
6     know what happened. I mean, you know we get a
7     report saying that -- I don't know. They're
8     like, "We can't give you any information." And
9     then awhile later my mother gets a report saying
10    he was found unresponsive in his cell. You know
11    what I mean?
12          It's like I wanted questions, and I wanted
13    answers, and I wanted it on that day, because my
14    brother died. And I was upset, and I wanted to
15    figure out what was going on. So I think I yelled
16    at him. As a matter of fact, I know I yelled at
17    him. And I called him probably some words that
18    you don't want to hear. But I wanted to know what
19    happened and he wouldn't tell me, so I told him he
20    was a rotten person.
21 Q  Do you remember when your brother told you about
22    Bartholomew? Is that who you said?
23 A  Bartholomew. I don't even know who he is. I
24    haven't met him. I'm not -- I don't know. But

EXHIBIT B

1   he's mentioned him on several occasions.
2 Q Do you remember the first time he mentioned him or
3   the last time he mentioned him?
4 A I don't remember. I just know that on occasions
5   they just -- he just said that he was, you know,
6   mean to him, that was about it. He was like, "I'm
7   just getting to the point where I'm not even going
8   to ask to go medical, because every time I go
9   there I sit there for eight hours and all they do
10  is give me a Motrin and tell me to go back to my
11  cell." He's like - and he's got to pay for the
12  medical visit, so he said, "It's not even worth
13  it." And he can't even take Motrin, because he's
14  allergic to it.
15 Q Are you aware of anyone else having any
16  conversations with any correction officers or
17  agents or employee of Bristol County regarding
18  your brother's medical condition?
19 A No.
20 Q Have you told me to the best of your memory here
21  today of all conversations or communications that
22  you had with any agent or employee of Bristol
23  County regarding your brother's medical condition?
24 A Yes.

- 172 -

1 Q Have you told me about all conversations that your
2   brother told you about that he had with any agent
3   or employee with Bristol County regarding his
4   medical condition?
5 A Have I told you -- I'm sorry?
6 Q Have you told me here today to the best of your
7   memory all conversations that your brother told
8   you he had with any agent or employee of Bristol
9   County?
10 A Have I told you guys?
11 Q Yes.
12 A Yes.
13          MR. PROULX: She may not understand the
14  scope of the employees at Bristol County. You may
15  want to just ----
16          MS. RYAN: Well, I told her at the
17  beginning if she didn't understand any of the
18  questions that I had, she could ask me to rephrase
19  them or repeat them and I'd be happy to
20  accommodate.
21 Q Have you understood my question?
22 A Does that mean the employees that work for the
23  jail? Is that what you mean?
24 Q Any employee or agent of the jails.

- 173 -

1 A Okay.
2 Q Do you understand that?
3 A The people that work for the jail is what you
4   mean?
5 Q Or anyone that's hired by the jail or contracted
6   out by the jail?
7 A I don't know.
8 Q Have you told me all the conversations that you
9   had with them, that you are aware that your
10  brother had with them, or anyone else had with
11  them regarding your brother?
12 A Yes, I haven't -- yes, I guess. I don't
13  understand. I don't know who's contracted. I
14  don't know what you mean by the jail, or -- I
15  think I understand what you mean, just the
16  employees.
17 Q Right.
18 A I haven't talked to any employees about the case.
19          Is that what you're asking me?
20 Q Have you spoken to anyone that you affiliate with
21  the jail or with the Bristol County regarding your
22  brother's medical condition?
23 A No, no. I haven't contacted the jail or anybody.
24 Q Even before your brother was sick, have you told

- 174 -

1   me about all the conversations?
2 A Oh, yes, with Dr. Andrews and -- yes, I told you
3   that, yes.
4 Q Anyone else that you can remember that you ever
5   had any conversations or communications with
6   regarding your brother's condition?
7 A I think to call Dr. Huth's office to double check
8   his medications.
9 Q Anybody else?
10 A No, not that I can think of.
11 Q Do you know if Dr. Huth ever called Dr. Andrews or
12  anyone at Bristol County?
13 A Yes. Dr. Huth called Dr. Andrews I was told.
14 Q Do you know if your mother ever called anyone at
15  Bristol County regarding the condition of your
16  brother?
17 A Yes.
18 Q Who did she speak with?
19 A With Dr. Andrews, I know that. And I'm not sure
20  who else she spoke to.
21 Q You're not aware of anyone else; is that correct?
22 A She's spoken to somebody there. I don't know who
23  she spoke with.
24 Q Are you aware of anybody else, either your father

- 175 -

**EXHIBIT B**